## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## ABILENE DIVISION

| | | |
|---|---|---|
| **JOJI JACOB VARGHESE, M.D.,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CASE NO.** _____ |
| | § | |
| **HENDRICK PROVIDER NETWORK** | § | **JURY TRIAL DEMANDED** |
| **D/B/A HENDRICK CLINIC; and** | § | |
| **HENDRICK HEALTH SYSTEM,** | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Joji Jacob Varghese, M.D., ("**Dr. Varghese**") and files this Original Complaint against Hendrick Provider Network d/b/a Hendrick Clinic ("**Clinic**") and Hendrick Health System ("**System**") (collectively, "**Hendrick**"). In support thereof, Dr. Varghese alleges as follows:

### PARTIES

1.      Plaintiff Joji Jacob Varghese, M.D., is an individual who, at all times relevant herein, resided in Abilene, Taylor County, Texas, but now resides in Southlake, Texas.

2.      Defendant Hendrick Provider Network d/b/a Hendrick Clinic is a Texas nonprofit corporation located in Abilene, Taylor County, Texas. Clinic may be served by and through its President, Brad Holland, at 1900 Pine Street, Abilene, Texas 79601, or wherever he may be found.

3.      Defendant Hendrick Health System is a Texas nonprofit corporation located in Abilene, Taylor County, Texas. Clinic may be served by and through its President and Chief

**ORIGINAL COMPLAINT**                                                    **PAGE 1 OF 31**

Executive Officer, Brad Holland, at 1900 Pine Street, Abilene, Texas 79601, or wherever he may be found.

## JURISDICTION & VENUE

4.     This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965 and supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

5.     Venue in this action lies within this Court pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Hendrick resides in this judicial district. Additionally, all or part of the events, acts, or omissions giving rise to the claims asserted herein occurred in this judicial district.

## STATEMENT OF FACTS

### A. Background

6.     Dr. Varghese was born in India, where he earned his two bachelor's degrees in medicine and surgery. Following graduation, Dr. Varghese completed his three-year residency at Southern Illinois University and served as Chief Resident his final year there. After completing his residency, Dr. Varghese completed a three-year cardiovascular fellowship at Baylor Scott & White Hospital, a one-year interventional cardiology fellowship at the University of Arkansas for Medical Sciences, and a three-month advanced structural and vascular fellowship at the Prairie Heart Institute. Over the course of his career, Dr. Varghese has had board certifications in multiple specialties, including internal medicine, cardiology, and echocardiography, and Dr. Varghese remains currently board-certified in interventional cardiology.

7.     In the past, Dr. Varghese has previously worked as clinical faculty and hospitalist at Baylor Scott & White Hospital in Temple, Texas, clinical preceptor at Texas Tech University's Pharmacy Residency Program in Abilene, Texas, clinical preceptor at Hardin-Simmons

**ORIGINAL COMPLAINT**                                                                                    **PAGE 2 OF 31**

University's Physician Assistant Program in Abilene, Texas, and associate clinical professor at Texas Tech University's School of Pharmacy in Abilene, Texas.

### B. Employment at the Clinic

8.      From August 2013 to August 2024, Dr. Varghese worked as an employee under contract at the Clinic as an interventional cardiologist.[1] On July 5, 2024, Dr. Varghese was the interventional cardiologist on-call at the Clinic's Cardiac Cath Lab ("**Lab**"). Dr. Derek Moore ("**Dr. Moore**"), another cardiologist employed by the Clinic, asked if Dr. Varghese was available to perform an intra-aortic balloon pump ("**IABP**") procedure on one of Dr. Moore's patients[2] who was awaiting a coronary artery bypass grafting procedure, and Dr. Varghese agreed to do so. That afternoon, the patient was brought to the Lab in stable condition for their IABP procedure.

9.      Upon reviewing the patient's medical history and condition, Dr. Varghese determined that it was safe and appropriate for Bailey Estes ("**Nurse Practitioner Estes**"), his nurse practitioner and registered nurse first assistant,[3] to perform the IABP procedure—one that Dr. Varghese personally trained Nurse Practitioner Estes to perform and that Nurse Practitioner Estes had performed previously under Dr. Varghese's supervision.[4] The IABP procedure is widely considered a low-risk procedure, involving only three straightforward surgical skills: (i) obtaining

---

[1] A true and correct copy of Dr. Varghese's Physician Employment Agreement, dated August 31, 2022, is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 1.** The August 31, 2022, Physician Employment Agreement was amended on March 1, 2023. A true and correct copy of Dr. Varghese's Amended Physician Employment Agreement is attached hereto, incorporated herein for all purposes as if stated verbatim and marked for identification as **Exhibit 2.**

[2] The identity of the patient referenced has been intentionally excluded for privacy considerations pursuant to the Health Insurance Portability and Accountability Act. The identity of the patient is easily ascertained by reviewing the medical records in the Clinic's possession or control.

[3] Nurse Practitioner Estes is a licensed vocational nurse, registered nurse first assistant, and nurse practitioner. Nurse Practitioner Estes has over 13 years of experience in the medical industry, 11 of which she spent at the Clinic.

[4] In fact, Dr. Varghese has supervised Nurse Practitioner Estes perform an IABP procedure on at least two prior occasions without any complications.

**ORIGINAL COMPLAINT**                                                    **PAGE 3 OF 31**

access into the right common femoral artery under ultrasound guidance, a step Nurse Practitioner Estes had performed at least 500 times; (ii) advancing a "J wire" into the aorta and exchanging it for the sheath, which Nurse Practitioner Estes had also completed at least 500 times; and (iii) advancing the balloon into the aorta under fluoroscopic guidance, a maneuver comparable to advancing balloons in complex peripheral vascular procedures, which Nurse Practitioner Estes performed under Dr. Varghese's supervision at least 50 times. After securing the balloon in place, the outside console automates the inflation and deflation of the balloon in synchronization with the patient's cardiac cycle. Across all these hundreds of procedures performed by Nurse Practitioner Estes, she has never experienced any complications.

10.    Between November 2019 and August 2024, Dr. Varghese worked with Nurse Practitioner Estes to make the Clinic's patients' medical care safer and more efficient by allowing Dr. Varghese to focus during the procedure on his patients' whole healthcare, and thereafter, by allowing the patients to work more closely with Nurse Practitioner Estes, who provides their post-operative care. Most importantly, this arrangement by which Dr. Varghese supervised Nurse Practitioner Estes[5] complied with all federal and state regulations, standard medical practice,[6] the Clinic's policy, and the authorizations granted to Nurse Practitioner Estes by the Clinic itself. The

---

[5] In addition to Nurse Practitioner Estes, Dr. Varghese also supervised two other nurse practitioners, Sterlynn Patterson and Jewel Trancoso, both of whom worked in non-procedural roles and did not require credentialing for surgical or procedural responsibilities.

[6] Rodgers et al., *2020 ACC Clinical Competencies for Nurse Practitioners and Physician Assistants in Adult Cardiovascular Medicine*, 15 AM. COLL. OF CARDIOLOGY No. 19, 2486, 2491 (2020) (approving nurse practitioners and physician assistants to perform "skill[s] to assist in implementation of mechanical circulatory support for patients with complications of acute coronary syndromes"); *Statement on Principles*, AM. COLL. OF SURGEONS (Apr. 12, 2016) ("The surgeon may delegate part of the operation to qualified practitioners including but not limited to residents, fellows, anesthesiologists, nurses, physician assistants, nurse practitioners, surgical assistants, or another attending under his or her personal direction").

**ORIGINAL COMPLAINT**                                                      **PAGE 4 OF 31**

Clinic has even allowed other similarly situated physicians to supervise nurse practitioners and physician assistants in procedural roles *without formal credentialing*.[7]

11.    On July 5, 2024, the patient and operating room were prepared at the Clinic for the IABP procedure, and Nurse Practitioner Estes scrubbed in and began the procedure. Importantly, at all times during the procedure, Dr. Varghese was *immediately* present in the operating room and supervised Nurse Practitioner Estes as she performed the procedure.[8] Ultimately, the patient tolerated the IABP procedure well, and no complications from the insertion of the IABP were noted.

12.    Following the IABP procedure, Dr. Varghese and Nurse Practitioner Estes went to their computers to log or chart the IABP procedure, as required by Clinic protocol. At Dr. Varghese's direction and under his supervision, Nurse Practitioner Estes logged into the Clinic's system using Dr. Varghese's credentials, a practice that is recognized by the Clinic. During this process, as always was his practice, Dr. Varghese sat right next to Nurse Practitioner Estes to oversee the documentation process and to review every document attributed to him as the responsible physician. Once Nurse Practitioner Estes finished documenting the IABP procedure based on Dr. Varghese's instructions, Dr. Varghese reviewed the document for accuracy and approved it as written.

---

[7] Doctor Carlson, Doctor Crocker, Doctor Green, and Doctor Simpson, all of whom are Caucasian physicians who are or were employed by the Clinic, routinely supervised nurse practitioners and physician assistants performing procedures in the operating room—*even without formal credentialing*—including invasive, high-risk procedures much different from the low-risk procedure performed by Nurse Practitioner Estes. In fact, Phil Brown, a physician assistant, even performed chest tube insertions in the Intensive Care Unit *without physician supervision or credentialing*. There were no complaints, investigations, or disciplinary actions by the Clinic related to these Caucasian physicians' "supervisory" arrangements.

[8] The Clinic expressly granted Nurse Practitioner Estes written authorization to perform surgical skills, including those required to perform an IABP procedure, so long as Dr. Varghese could be at her aid within 30 minutes. Though not required under this authorization, Dr. Varghese was immediately present alongside Nurse Practitioner Estes throughout this entire IABP procedure.

**ORIGINAL COMPLAINT**                                                                                    **PAGE 5 OF 31**

13.     Approximately one week later, on July 11, 2024, Dr. Robert Wiley ("**Dr. Wiley**"), a Pediatrician and Hendrick's Vice President and Chief Medical Officer, sent Dr. Varghese a text message requesting that Dr. Varghese and Nurse Practitioner Estes meet with him in Dr. Wiley's office located at the Clinic at 7:00 a.m. the following day, July 12, 2024.

14.     When Dr. Varghese and Nurse Practitioner Estes arrived for the meeting on July 12, 2024, they were surprised to learn that Angie Wagner ("**Ms. Wagner**"), Hendrick's Senior Director of Cardiovascular Services, was also in attendance. Ms. Wagner is not a physician and is not authorized to either perform or supervise the performance of an IABP procedure. At the July 12, 2024, meeting, Dr. Wiley and Ms. Wagner questioned Dr. Varghese and Nurse Practitioner Estes regarding the IABP procedure performed on July 5, 2024.[9] Throughout the meeting, Ms. Wagner incorrectly claimed that Nurse Practitioner Estes lacked the proper certifications to perform any procedure in the Lab despite being reminded that Nurse Practitioner Estes's education, expertise, experience, and certifications establish that Nurse Practitioner Estes has the requisite education, training, skill, and authorization by the Clinic to perform the IABP procedure.

15.     Additionally, when Dr. Mark Lawrence ("**Dr. Lawrence**"), Hendrick's Chief of Cardiology, was asked about the July 5, 2024, IABP procedure, Dr. Lawrence reviewed the IABP procedure records and concluded that the IABP procedure was low risk and that no action was needed regarding Nurse Practitioner Estes's involvement. Nurse Practitioner Estes's role in the IABP procedure was routine, safe, and fully consistent with accepted practice at Hendrick and peer institutions nationwide.

---

[9] Dr. Wiley, as a pediatrician, is not credentialed to perform or supervise procedures relating to Interventional Cardiology. Similarly, Ms. Wagner, as an administrator with her highest medical degree being a registered nurse certification, is not credentialed to perform or supervise any procedure—much less one relating to Interventional Cardiology.

**ORIGINAL COMPLAINT**                                                                 **PAGE 6 OF 31**

16.     Two weeks later, on July 31, 2024, Dr. Wiley requested to meet with Dr. Varghese and Nurse Practitioner Estes once again.[10] Later that same day, on July 31, 2024, Dr. Varghese and Nurse Practitioner Estes met with Dr. Wiley, Kirk Canada ("**Mr. Canada**"), Hendrick's Chief Operating Officer, and Susan Greenwood ("**Ms. Greenwood**"), Hendrick's Chief Nursing Officer, in one of Hendrick's administrative boardrooms. Other than Dr. Varghese and Nurse Practitioner Estes, no one present at this meeting was credentialed to perform or supervise an IABP procedure. During this July 31, 2024, meeting, Dr. Wiley presented Dr. Varghese and Nurse Practitioner Estes with a memorandum outlining, among other things, an action plan regarding new expectations for documenting procedures.[11] Dr. Varghese and Nurse Practitioner Estes were directed to—and did— sign the memorandum. There was no indication provided by the Clinic that any disciplinary action was forthcoming.

17.     However, *on the very next day*, August 1, 2024, Mr. Canada and Courtney Head ("**Ms. Head**"), Hendrick's Vice President of Human Resources, asked to meet with Dr. Varghese and Nurse Practitioner Estes that same afternoon in one of Hendrick's administrative boardrooms. Upon arrival, Dr. Varghese and Nurse Practitioner Estes were terminated from their employment at the Clinic and were then escorted out of the Clinic by a security guard.[12] Additionally, on September 23, 2024, the Clinic notified Dr. Varghese that his privileges to perform surgical procedures at the Clinic and any other System-affiliated facility were revoked, effective August 1,

---

[10] A true and correct copy of the July 31, 2024, text message sent by Dr. Wiley to Dr. Varghese and Ms. Estes is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 3**.

[11] A true and correct copy of the July 31, 2024, memorandum is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 4.**

[12] A true and correct copy of the August 1, 2024, termination letter is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 5.** Prior to his termination, Dr. Varghese had no disciplinary actions during his 11 years of employment by the Clinic.

**ORIGINAL COMPLAINT**                                                          **PAGE 7 OF 31**

2024, the date of Dr. Varghese's termination of employment at the Clinic.[13] The Clinic failed to give Dr. Varghese any hearing—much less, a fair one—regarding the alleged "cause" for his termination, depriving him of his contractual and due process rights.[14]

18.     As the principal investigator on several national and international medical studies, Dr. Varghese's dismissal abruptly disrupted these clinical trial operations, undermining sponsor confidence and academic collaborations.[15] Moreover, the reputational damage from Dr. Varghese's unwarranted termination has cost him significant speaking and leadership opportunities at national conferences. Additionally, many of his clinical studies were forced to stop enrolling patients, depriving the Abilene community of access to cutting-edge treatment technologies and modalities.

19.     On August 2, 2024, the day after Dr. Varghese's termination, Dr. Varghese was offered a job as a Cardiologist with West Texas Health, a private practice group in Abilene. However, Dr. Varghese could not accept this position due to Hendrick's arbitrary enforcement of Dr. Varghese's non-compete provision. Multiple patients and physicians in Abilene also requested that Dr. Varghese remain in the community, given his unique expertise. Dr. Varghese was the sole physician who was performing advanced below-the-knee vascular interventions between the cities

---

[13] A true and correct copy of the September 23, 2024, letter is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 6.**

[14] The only cause for the Clinic's termination of Dr. Varghese's employment was for his alleged misconduct during the IABP procedure because there was no other time Dr. Varghese met with the Clinic about any other issue, nor was Dr. Varghese advised by the Clinic that he had violated any of Hendrick's policies.

[15] Many of these ongoing clinical research studies were bringing cutting-edge therapies to underserved populations in West Texas, including: (a) the ALLAY-HF Septostomy Trial, a multicenter, randomized, sham-controlled, double-blind trial of the Alleviant ALV1 System in HFpEF/HFmrEF; (b) the TRANSFORM Trial, a prevention trial enrolling 7,500 patients with pre-diabetes, type 2 diabetes, or metabolic syndrome; (c) AMP-CLI Registry, a prospective registry for patients with chronic limb-threatening ischemia to reduce amputations; (d) the Jet-I DVT Registry, a post-market, multicenter registry evaluating the JETi Hydrodynamic Thrombectomy System for acute and subacute lower-extremity DVT.

**ORIGINAL COMPLAINT**                                                                 **PAGE 8 OF 31**

of Lubbock and Fort Worth, a skill critical for preventing amputations and maintaining Hendrick's cutting-edge vascular and research programs. Despite these public health benefits Dr. Varghese brought to the region, Hendrick categorically refused to reinstate him, further harming Dr. Varghese's professional career and the region by depriving the community of life- and limb-saving care that only Dr. Varghese could provide at the time.

20.     Following the Clinic's termination of Dr. Varghese, the Clinic threatened to make misrepresentations to the Texas Medical Board ("**TMB**") via wire or mail regarding the July 5, 2024, IABP procedure. In the threatened report, the Clinic threatened to falsely claim that Dr. Varghese and Nurse Practitioner Estes engaged in the unauthorized practice of medicine and engaged in fraudulent documentation practices.

21.     Inexplicably, on October 23, 2024, Dr. Steven Brown ("**Dr. Brown**"), the Clinic's Chief of Staff, sent a letter to Dr. Varghese, notifying him that the Clinic's Board of Trustees reviewed and approved Dr. Varghese's "resignation."[16] Dr. Varghese never resigned from his position and has never been given an explanation as to why Dr. Brown sent this letter.

22.     In Dr. Varghese's employment contract, there was a non-compete agreement.[17] The Clinic at all times since Dr. Varghese's termination has threatened to enforce the non-compete provisions of Dr. Varghese's employment agreement, thus depriving him the ability to work and support his family which resulted in Hendrick driving him and his family from their community, home, church, and close friends to find other employment in a distant city, resulting in reputational damage and an immediate and irreparable reduction in income to support himself and his family.

---

[16] A true and correct copy of the October 23, 2024, letter is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 7.**

[17] *See* **Exhibit 1**, at ¶ 8.1.

**ORIGINAL COMPLAINT**                                                      **PAGE 9 OF 31**

Caucasian physicians employed by the Clinic have not had the identical non-compete provisions in their employment contracts enforced under similar employment circumstances.

23.     On January 23, 2025, Dr. Varghese filed a charge of discrimination with the Equal Employment Opportunity Commission ("**EEOC**"), complaining of the Clinic's discrimination. Dr. Varghese has since obtained a right to sue letter from the EEOC to proceed with this lawsuit.[18]

## C.  The System's Anti-Competitive Conduct

24.     In 2019, the Texas Legislature added Chapter 314A to the Texas Health and Safety Code, finding that the public benefits of certain hospital mergers in rural counties may outweigh any anti-competitive effects. The Governor of Texas designated the Texas Health and Human Safety Commission ("**THHSC**") as the government agency responsible for reviewing, approving, denying, and supervising[19] certificates of public advantage ("**COPA**") applications.

25.     In 2020, the System submitted its COPA application seeking regulatory approval for its acquisition of Abilene Regional Medical Center ("**Abilene Regional**"), the System's then-existing only major competitor.[20] Despite the antitrust concerns raised by the Office of the Attorney General of the State of Texas ("**OAG**"), the Federal Trade Commission ("**FTC**"),[21] and numerous community groups, the THHSC granted[22] the System's COPA application on October

---

[18] A true and correct copy of the right to sue letter is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 8.**

[19] Hospital systems are required to file quarterly and annual performance reports to prove their ongoing compliance with the terms and conditions of their COPA status.

[20] A true and correct copy of the System's COPA application is attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification as **Exhibit 9.**

[21] The FTC submitted a 70-page recommendation against the System's COPA application. **Exhibit 10**.

[22] According to the THHSC's website, the only other Texas hospital system that has been issued a COPA is Shannon Health System in San Angelo, Texas. *Certificate of Public Advantage*, TEX. HEALTH & HUM. SERVS., https://www.hhs.texas.gov/providers/health-care-facilities-regulation/certificate-public-advantage (last visited Aug. 20, 2025).

**ORIGINAL COMPLAINT**                                             **PAGE 10 OF 31**

2, 2020, approving the System's acquisition of Abilene Regional Medical Center ("**Abilene Regional**").

26.     In the System's COPA application, the System made three broad representations that are now false. First, the System claimed that THHSC issuing the System a COPA would improve healthcare access to the region, decrease healthcare costs, and bring the System's "extensive portfolio of specialized services" to a region that otherwise lacked access to such services. At the time of submitting its COPA application, the System operated a cardiovascular lab, outpatient cardiology clinic, and other programs—all of which Dr. Varghese contributed to substantially. However, during the four years under COPA, the System has restructured its cardiology services by converting its outpatient cardiology clinic into a System-affiliated location.[23] This change appears to have been implemented solely to drive up patients' costs and system revenues, resulting in patients being charged hospital facility fees that increased the price of life-saving cardiology care by as much as 4–5 times, compared to previous outpatient rates.

27.     Additionally, the System claimed that being issued the COPA would not involve any "appreciable danger of any meaningful competitive harm from the transaction." However, the OAG and the FTC reviewed the System's application and determined that there were significant anti-competitive effects from the System's acquisition of Abilene Regional. Rather than take any meaningful steps to address these reasonable concerns, the System concluded, without any support, that the acquisition would have the exact opposite of an anti-competitive effect because it would spur competition in the region. Contrary to the System's representations; however, in the four years of having the COPA certification, the System has acquired Midwest Ambulatory Surgical Center

---

[23] *Compare* **Exhibit 9, App. A** *with* **Exhibit 11, p. 57–58**, a true and correct copy of the System's 2024 Q2 report attached hereto, incorporated herein for all purposes as if stated verbatim, and marked for identification.

("**Surgical Center**") and converted the Surgical Center into a System hospital-affiliated service, driving up healthcare costs for patients.[24] Even prior to that acquisition, the System even acknowledged that the COPA certification would result in the System owning 35 of the medical facilities in the region, leaving no medical facilities that provide intensive cardiovascular care. In addition, the System engaged in anti-competitive conduct by incorporating a multi-year non-compete provision into its physicians' contracts, limiting the ability of highly skilled caregivers, such as Dr. Varghese, from providing medical care to the region—that is, unless they would do it through a System-affiliated facility and on the System's terms.[25]

28.    Finally, the System claimed that being issued the COPA certification would make the System "better positioned to recruit and retain the very best talent" in a region that faces a shortage of physicians and skilled caregivers that "specialize in complex medical procedures."[26] However, within the past 12 months, the System has arbitrarily terminated various skilled and experienced cardiovascular caregivers, including Dr. Varghese and Nurse Practitioner Estes. Moreover, Dr. Varghese's departure resulted in the termination of multiple ongoing clinical research studies, many of which were bringing cutting-edge therapies to underserved populations in West Texas, and prevented the introduction of new interventional, structural, and investigational programs that had been slated for the region.[27]

29.    Accordingly, since receiving its COPA certification, the System has: (i) actively reduced out-patient care options while also drastically increasing healthcare costs; (ii) taken substantial action to maintain a monopoly over the healthcare provider market in the region; (iii)

---

[24] *Compare* **Exhibit 9, App. B** *with* **Exhibit 11, p. 57–58**.

[25] *See* **Exhibit 1**.

[26] **Exhibit 9, p. 7, 30**.

[27] *See supra* note 15.

**ORIGINAL COMPLAINT**                                                    **PAGE 12 OF 31**

decreased the number of skilled and experienced physicians in the region; and (iv) significantly derailed and harmed clinical innovation, academic reputation, and patient care advancement in the region. The System's actions were calculated, anti-competitive, and run afoul of the Texas Legislature's intention of using COPA certifications to maximize healthcare access and efficiency while minimizing healthcare costs.

30.     Because of Hendrick's illegal termination of Dr. Varghese's employment and Hendrick's monopoly over the region's healthcare industry, Dr. Varghese has been frozen out of the market and was forced to obtain employment approximately 120 miles away, relocate his family from a community to which they were active contributors, sell his home in Abilene, and accept a job that pays substantially less.

### D.  Pervasive History of Discrimination

31.     The Clinic has a pervasive history of discrimination, namely by disciplining minority physicians more harshly than Caucasian physicians by arbitrarily terminating and replacing minority physicians with Caucasian physicians, by selectively and discriminatorily enforcing non-compete provisions, and by replacing physicians over the age of 40 with younger physicians.

32.     During Dr. Varghese's employment, the Clinic refused to terminate at least five other physicians despite their egregious violations of standard medical practices, nationwide standards, Clinic protocol, and ethical obligations. Dr. Alex Armor, a Caucasian cardiologist, had multiple negligent complications resulting in numerous patient deaths and sexually assaulted a patient under anesthesia, yet the Clinic refused to discipline or terminate Dr. Armor. Dr. Gorman Thorp, a Caucasian cardiologist, threatened to fire Dr. Varghese when Dr. Varghese voiced his concerns about Dr. Armor's concerning history of patient complications, yet the Clinic refused to

**ORIGINAL COMPLAINT**                                           **PAGE 13 OF 31**

discipline or terminate Dr. Thorp for his threats against Dr. Varghese. Dr. John McClish, a Caucasian cardiologist, was repeatedly accused of operating on patients while he was under the influence of alcohol, yet the Clinic refused to discipline or terminate Dr. McClish. Dr. Mark Lawrence, a Caucasian cardiologist, was repeatedly accused of sexual misconduct and inappropriate behavior toward Clinic staff, yet the Clinic refused to discipline or terminate Dr. Lawrence. Finally, Dr. Jason Bell, a Caucasian endocrinologist, brought a firearm to the Clinic and threatened Clinic staff, yet the Clinic refused to discipline or terminate Dr. Bell. The only reason the Clinic retained these five physicians despite their egregious conduct yet terminated Dr. Varghese is because of the Clinic's discriminatory animus towards Dr. Varghese because of his race, color, and national origin.

33. Also, the last seven minority physicians terminated by Hendrick who were the subjects of adverse employment actions in the form of termination or forced resignation by the Clinic were all non-Caucasian, naturalized citizens: Dr. Deepak Malhotra (Indian); Dr. Christian Otero (Columbian); Dr. Nikunj Kumar Patel (Indian); Dr. Joji Varghese (Indian); Dr. Harvinder Arora (Indian); Dr. Venkat Amineni (Indian); and Dr. Daniel Canario (Portuguese). Notably, the Clinic replaced five of these physicians with Caucasian physicians.

34. Additionally, all of the Clinic's physician contracts include a multi-year non-compete clause prohibiting a physician, upon departure, from practicing medicine within the region. However, the Clinic selectively enforces the non-compete provision against the non-Caucasian, non-White, and naturalized physicians—like Dr. Varghese. For example, the Clinic waived the non-compete provision for, at least, three Caucasian doctors—Dr. David McCain in 2022, Dr. Whitney Mascarro in 2023, and Dr. Kevin Bridge in 2025—while enforcing Dr.

Varghese's non-compete provision. The Clinic's selective enforcement[28] of the non-compete provision is based on the Clinic's discriminatory animus against minority physicians.

35.    Finally, the Clinic treats physicians over the age of 40 years differently than younger physicians. Specifically, the Clinic terminated Dr. Nikunj Patel, a physician over the age of 40 years, in 2021, and replaced him with Dr. Gibbs Wilson, a younger physician, on July 1, 2021. Additionally, the Clinic constructively discharged Dr. Harvinder Arora, a physician over the age of 40 years, in November 2023, and replaced him with Dr. Jonathan Urbancyzk, a physician under the age of 40 years, shortly before Dr. Arora's discharge. Finally, the Clinic terminated Dr. Varghese, a physician over the age of 40 years, on August 1, 2024, and replaced him *that same day* with Dr. Dhruv Raj Purohit, physician under the age of 40 years.

36.    This practice is fueled by the Clinic's effort to reduce its costs as "older" physicians have more experience and notoriety—and with that, a higher salary than younger physicians. By eliminating the older physicians through discriminatory conduct, the Clinic decreased costs for themselves and concomitantly reduce the quality of care their patients could receive.

## CAUSES OF ACTION AGAINST THE CLINIC

*Count I – Discrimination Based on Race under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981*

37.    Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

38.    Section 1981 of the Civil Rights Act of 1866 ("**Section 1981**") prohibits discrimination on the basis of race. 42 U.S.C. § 1981.

---

[28] The enforcement of the non-compete waivers are determined exclusively by Brad Holland, a Caucasian and Hendrick's CEO, using his own undisclosed criteria to decide whether to enforce or waive the non-compete clauses for any physician. His arbitrary and capricious conduct further underscored the discriminatory animus unleashed on minority physicians.

**ORIGINAL COMPLAINT**                                                    **PAGE 15 OF 31**

39. Dr. Varghese is Asian, a protected class under Section 1981. The Clinic lacked just cause to terminate Dr. Varghese because he was qualified for his position. Dr. Varghese was qualified for his position as an interventional cardiologist because he had over 20 years in the healthcare industry, is board-certified in interventional cardiology, had no disciplinary history, had 10 years of experience working at the Clinic, and was—and remains—well-regarded in the medical and local community. Additionally, Dr. Varghese supervised Nurse Practitioner Estes while she performed the IABP procedure, a procedure that Nurse Practitioner Estes was qualified and authorized to perform under Dr. Varghese's training and supervision—and had done so multiple times previously. Moreover, Dr. Varghese dictated and approved all documentation related to the procedure. Because Dr. Varghese was not only qualified for his position but also complied with the appropriate standards and protocols, the Clinic lacked just cause to terminate Dr. Varghese.

40. As discussed *supra*, the Clinic has a pervasive history of treating non-Caucasian physicians differently than Caucasian physicians. Specifically, the Clinic retained four Caucasian physicians despite their committing egregious violations of standard medical practices, nationwide standards, Clinic protocol, and ethical obligations, yet terminated Dr. Varghese without cause. Additionally, the Clinic selectively enforces its non-compete provision against non-Caucasian physicians while waiving such provision for Caucasian physicians. Moreover, the last seven physicians terminated by the Clinic were non-Caucasian, and five of these physicians were replaced by Caucasian physicians. Furthermore, the Clinic discriminatorily permits Caucasian physicians to supervise nurse practitioners and physician assistants performing procedures— sometimes without the physician present—while disallowing non-Caucasian physicians from doing the same.

**ORIGINAL COMPLAINT**                                                 **PAGE 16 OF 31**

41.    The Clinic, motivated by racial animus, intentionally and pretextually terminated Dr. Varghese's employment from a position for which he was qualified and had not violated any regulations, laws, or policies. As a result, the Clinic deprived Dr. Varghese of his contract-negotiated employment, impaired his ability to practice medicine where he raised a family and became an active member of the local and medical community, in violation of Section 1981. As actual and proximate cause of the Clinic's discriminatory conduct, Dr. Varghese has suffered past and future lost wages, loss in reputation, and past and future physical and emotional distress.

### *Count II – Race, Color, and National Origin Discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e*

42.    Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

43.    Title VII of the Civil Rights Act of 1964 ("**Title VII**") prohibits employers from discharging or treating differently any individual because of their race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2.

44.    Dr. Varghese is Asian (race), dark-complexioned (color), and Indian (national origin)—all of which are protected classes under Title VII. Dr. Varghese was qualified for his position as an interventional cardiologist because he had over 20 years in the healthcare industry, is board-certified in interventional cardiology, had no disciplinary history, had 10 years of experience working at the Clinic, and was—and remains—well-regarded in the medical and local community.

45.    The Clinic lacked just cause to terminate Dr. Varghese. Though Dr. Varghese's termination letter did not specify the reason for his termination other than "for cause," Dr.

Varghese believes the reason relates to the July 5, 2024, IABP procedure.[29] However, at all times, Dr. Varghese complied with standard medical practices, nationwide standards, and Clinic protocol. Specifically, Dr. Varghese supervised Nurse Practitioner Estes while she performed the IABP procedure, a procedure that Nurse Practitioner Estes was qualified and authorized to perform and did perform on multiple occasions under Dr. Varghese's training and supervision. Additionally, Dr. Varghese dictated and approved all documentation related to the procedure. Accordingly, the Clinic lacked just cause to terminate Dr. Varghese.

46.     The Clinic treated Dr. Varghese differently than his Caucasian colleagues in its disparate disciplinary action. First, the Clinic refused to terminate at least five other physicians despite their egregious violations of standard medical practices, nationwide standards, Clinic protocol, and ethical obligations. Dr. Alex Armor, a Caucasian cardiologist, had multiple negligent complications resulting in numerous patient deaths and sexually assaulted a patient under anesthesia, yet the Clinic refused to terminate Dr. Armor. Dr. Gorman Thorp, a Caucasian cardiologist, threatened to fire Dr. Varghese when Dr. Varghese voiced his concerns about Dr. Armor's concerning history of patient complications, yet the Clinic refused to terminate Dr. Thorp. Dr. John McClish, a Caucasian cardiologist, was repeatedly accused of operating on patients while under the influence of alcohol, yet the Clinic refused to terminate Dr. McClish. Dr. Mark Lawrence, a Caucasian cardiologist, was repeatedly accused of sexual misconduct and inappropriate behavior toward Clinic staff, yet the Clinic refused to terminate Dr. Lawrence. Finally, Dr. Jason Bell, a Caucasian cardiologist, brought a firearm to the Clinic and threatened Clinic staff, yet the Clinic refused to terminate Dr. Bell. The only reason the Clinic retained these

---

[29] The only cause for the Clinic's termination of Dr. Varghese's employment was for his alleged misconduct during the IABP procedure because there was no other time Dr. Varghese met with the Clinic about any other issue, nor was Dr. Varghese advised by the Clinic that he had violated any of Hendrick's policies.

**ORIGINAL COMPLAINT**                                    **PAGE 18 OF 31**

five physicians despite their egregious conduct yet terminated Dr. Varghese is because of the Clinic's discriminatory animus against Dr. Varghese because of his race, color, and national origin.

47. Moreover, the Clinic has a pervasive history of discrimination against minorities. The last seven physicians terminated—or who were forced to resign—by the Clinic are non-Caucasian, naturalized citizens: Dr. Deepak Malhotra (Indian); Dr. Christian Otero (Columbian); Dr. Nikunj Kumar Patel (Indian); Dr. Joji Varghese (Indian); Dr. Harvinder Arora (Indian); Dr. Venkat Amineni (Indian); and Dr. Daniel Canario (Portuguese). Notably, the Clinic replaced five of these physicians with Caucasian physicians.

48. Furthermore, the Clinic discriminatorily permits Caucasian physicians to supervise nurse practitioners and physician assistants performing procedures—sometimes without the physician present—while disallowing non-Caucasian physicians from doing the same.[30]

49. Additionally, the Clinic treated Dr. Varghese differently than those outside his protected class by selectively enforcing non-compete provisions. All of the Clinic's physician contracts include a non-compete clause prohibiting a physician, upon departure, from practicing medicine within the region. However, the Clinic selectively enforces the non-compete provision against the non-Caucasian, non-White, and naturalized physicians—like Dr. Varghese. For example, the Clinic waived the non-compete provision for, at least, three Caucasian doctors—Dr. David McCain, Dr. Kevin Bridge, and Dr. Whitney Mascarro—while enforcing Dr. Varghese's non-compete. The Clinic's selective enforcement of the non-compete provision is based on the Clinic's discriminatory animus against Dr. Varghese's protected classes.

---

[30] Doctor Carlson, Doctor Crocker, Doctor Green, and Doctor Simpson, all of whom are Caucasian physicians who are or were employed by the Clinic, routinely supervised nurse practitioners and physician assistants performing procedures in the operating room—*even without formal credentialing*—including invasive, high-risk procedures. In fact, Phil Brown, a physician assistant, even performed chest tube insertions in the Intensive Care Unit *without physician supervision or credentialing*. There were no complaints, investigations, or disciplinary actions related to these Caucasian physicians' "supervisory" arrangements.

**ORIGINAL COMPLAINT**                                                    **PAGE 19 OF 31**

50.    Accordingly, the Clinic has treated Dr. Varghese less favorably than those similarly situated outside Dr. Varghese's protected classes. In doing so, the Clinic acted maliciously and with reckless indifference to Dr. Varghese's right to be free from discrimination based on his race, color, and national origin. As actual and proximate cause of the Clinic's discriminatory conduct, Dr. Varghese has suffered past and future lost wages, loss in reputation, and past and future physical and emotional distress. Dr. Varghese exhausted his administrative remedies by filing a charge of discrimination with the EEOC on January 23, 2025, and obtaining a right to sue letter thereafter.

**Count III – Discrimination Based on Age under the Age Discrimination in Employment Act of 1967, 39 U.S.C. § 621**

51.    Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

52.    The Age Discrimination in Employment Act of 1967 ("**ADEA**") prohibits employers from discriminating against individuals 40 years of age or older based on their age. 29 U.S.C. § 621.

53.    Dr. Varghese is at present, and at all times relevant to the instant suit was, over the age of 40 years and, therefore, falls within the class protected by the ADEA. Dr. Varghese was qualified for his position as an interventional cardiologist because he had over 20 years in the healthcare industry, is board-certified in interventional cardiology, had no disciplinary history, had 10 years of experience working at the Clinic, and was—and remains—well-regarded in the medical and local community. Dr. Varghese's supervision of the IABP procedure and the corresponding documentation process complied with standard medical practices, nationwide standards, and Clinic protocol. Accordingly, the Clinic lacked just cause to terminate Dr. Varghese.

54.    The Clinic has a pervasive history of treating physicians over the age of 40 years differently than younger physicians. Specifically, the Clinic discharged Dr. Patel, Dr. Arora, and Dr. Varghese—all of whom are physicians over the age of 40 years—and replaced them with physicians under the age of 40 years. This practice is fueled, at least in part, by the Clinic's effort to reduce its costs as "older" physicians tend to have more experience and notoriety—and with that, a higher salary than younger physicians.

55.    The Clinic intentionally discriminated against Dr. Varghese due to his age, in violation of the ADEA. As a direct and proximate cause of the Clinic's discriminatory conduct, Dr. Varghese has suffered past and future lost wages, loss in reputation, and past and future physical and emotional distress.

***Count IV – Tortious Interference with Prospective Business Relations***

56.    Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

57.    Beginning on or around August 1, 2024, the Clinic intentionally interfered with Dr. Varghese's prospective business relations with his patients by removing his surgical privileges in order to freeze Dr. Varghese out of the Abilene healthcare market. The Clinic's actions are akin to fraud in that the removal of Dr. Varghese's privileges was a farce intended to conceal the Clinic's discriminatory animus against him. The Clinic did so intentionally and knowing this alone with freeze Dr. Varghese out of the region and make him an unattractive candidate for other medical opportunities elsewhere in the State of Texas since Hendrick has monopolistic control over the region's healthcare market.

58.    The Clinic's actions hindered—and continue to hinder—Dr. Varghese's ability to obtain privileges at other healthcare facilities. Dr. Varghese is an accomplished physician with an

impressive professional record that was, prior to the Clinic's actions, untarnished. As a result of the Clinic's actions, Dr. Varghese was forced to obtain employment approximately 120 miles away, relocate his family from a community to which they were active contributors, and accept a job that pays substantially less. As an actual and proximate cause of the Clinic's actions, Dr. Varghese has suffered past and future lost wages, loss in reputation, and past and future physical and emotional distress. Moreover, the Clinic's malicious actions entitle Dr. Varghese to exemplary damages under Section 41.003(a) of the Texas Civil Practice and Remedies Code.

### Count V – Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq.

59.    Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

60.    "RICO creates a [civil] cause of action for '[a]ny person injured in this business or property.'" *Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 936 (2025) (quoting 18 U.S.C. § 1964(c)). To maintain such a claim, the plaintiff need not allege a racketeering or RICO-type injury; all that is required is business or property harm resulting from the defendant's predicate acts. *Id.* at 942–43.

61.    Following the Clinic's termination of Dr. Varghese, the Clinic threatened to make misrepresentations to the Texas Medical Board ("**TMB**") via wire or mail regarding the July 5, 2024, IABP procedure. In the report, the Clinic threatened to falsely claim that Dr. Varghese perpetrated the unauthorized practice of medicine and engaged in fraudulent procedure documentation practices. The Clinic, by threatening to do so, acted with the intent to defraud the TMB, cover up the Clinic's discriminatory animus toward minority physicians, and financially benefit from freezing Dr. Varghese out of the healthcare market in the region. In addition, the

Clinic fraudulently and inexplicably labeled Dr. Varghese's termination as a "resignation." *Compare* **Exhibit 5** *with* **Exhibit 7**.

62.     As a direct and proximate result of the Clinic's predicate conduct outlined above in violation of 18 U.S.C. § 1962(a), Dr. Varghese has suffered harm to his business and property. Under the provisions of RICO, Dr. Varghese is entitled to recover economic and treble damages, costs of suit, and attorneys' fees.

### *Count VII – Breach of Contract*

63.     Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

64.     On August 31, 2022, Dr. Varghese and the Clinic entered into a Physician Employment Agreement ("**Agreement**"), a valid and enforceable written contract. The Agreement provided that the Clinic would employ Dr. Varghese as an interventional cardiologist, and Dr. Varghese would accept such employment in exchange for a full-time salary pursuant to the Clinic's compensation plan, for a period of three years, ending on August 31, 2025.

65.     Dr. Varghese fully performed his contractual obligations under the Agreement by exclusively and actively practicing medicine in his specialties of interventional cardiology and cardiovascular medicine on behalf of the Clinic and in compliance with all applicable policies, regulations, and laws.

66.     The Clinic breached the Agreement on August 1, 2024, by terminating Dr. Varghese under the pretextual guise of "cause," despite there being no legitimate cause for his termination other than the Clinic's discriminatory animus against Dr. Varghese, and by terminating his privileges to practice medicine at the Clinic's facilities.

**ORIGINAL COMPLAINT**                                          **PAGE 23 OF 31**

67.     The Clinic's breach of the Agreement caused injury to Dr. Varghese. Specifically, the Clinic's breach froze Dr. Varghese out of the Abilene healthcare market, forcing him to relocate his family, leave his community, and seek employment elsewhere at a much lower salary. Dr. Varghese has diligently worked to minimize his damages resulting from the Clinic's breach.

68.     Dr. Varghese seeks liquidated damages in an amount to ultimately be proven at trial but that is within the jurisdictional limits of this Court.

69.     Dr. Varghese demands recovery of his reasonable and necessary attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code, damages Dr. Varghese would not have incurred but for the Clinic's breach of the Agreement.

## CAUSES OF ACTION AGAINST THE SYSTEM

***Count I – Federal Antitrust Violations under the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1–2***

70.     Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

71.     Section 1 of the Sherman Antitrust Act of 1890 ("**Sherman Act**") prohibits all unreasonable restraints of interstate or foreign commerce or trade. 15 U.S.C. § 1. By integrating a multi-year non-compete provision into Dr. Varghese's physician contract, the System, acting through the Clinic, unreasonably restrained Dr. Varghese's ability to practice medicine in the region, a region the System claims has a physician shortage and that the System has monopolistic control over. This unreasonable restraint on Dr. Varghese's trade—i.e., medical practice—is in direct violation of Section 1 of the Sherman Act. *See Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 328–29 (1991) (holding that interference with a physician's medical practice affects interstate trade and commerce "as a matter of practical commerce").

72.     Similarly, Section 2 of the Sherman Act prohibits the actual or attempted monopolization of any part of interstate or foreign commerce or trade. 15 U.S.C. § 2. The System knowingly and intentionally acquired Abilene Regional, the System's only major competitor in the region despite the concerns raised by the OAG, the FTC, and numerous community groups. These concerns centered around the healthcare monopoly that would be created if the System acquired Abilene Regional, particularly as it relates to the restrictions the acquisition would have on rural Texans' access to and choice of healthcare providers. As the System admitted in its COPA application, even without its acquisition of Abilene Regional, the System already owned 35 of the medical facilities in region,[31] leaving none that provide intensive cardiovascular care.

73.     Importantly, the System continued to expand its healthcare monopoly even after its acquisition of Abilene Regional by converting the affordable out-patient healthcare offered by the Surgical Center into a for-profit, hospital-affiliated service. The System's actions were calculated to ensure that the System obtains—and retains—a monopoly over the healthcare market in the region and to line its pockets at the expense of the public. Therefore, the System has willfully obtained a monopoly over the healthcare market in the region, which is in direct violation of Section 2 of the Sherman Act.

***Count II – Federal Antitrust Violations under the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 12–27***

74.     Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

75.     The Clayton Antitrust Act of 1914 ("**Clayton Act**") prohibits the actual or attempted monopolization of any part of interstate or foreign commerce or trade. 15 U.S.C. § 12.

---

[31] Abilene is approximately 112 square miles, meaning that, even before its acquisition of Abilene Regional, the System had a healthcare facility approximately every three miles.

**ORIGINAL COMPLAINT**                                          **PAGE 25 OF 31**

76.     Despite the concerns of the OAG, the FTC, and community groups regarding the healthcare monopoly that would be created by the System if the acquisition went through, the System knowingly and intentionally acquired Abilene Regional, the System's only major competitor in the region. The System knew of the effect its healthcare monopoly would have on rural Texans' access to and choice of healthcare providers yet proceeded with the acquisition, leaving no competitor offering intensive cardiovascular care.

77.     The System further perpetrated its healthcare monopoly by converting affordable out-patient healthcare into a for-profit, hospital-affiliated service. The System's actions were calculated to ensure that the System obtains—and retains—a monopoly over the healthcare market in the region for its sole benefit by decreasing competition. Accordingly, the System's intentional, calculated, and anti-competitive actions are in direct violation of the Clayton Act.

### *Count III – State Antitrust Violations under the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15*

78.     Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

79.     The Texas Free Enterprise and Antitrust Act of 1983 ("**TFEAA**") prohibits any restraint of trade or commerce. TEX. BUS. & COM. CODE § 15.05(a). The purpose of the TFEAA is to "maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers" in the State of Texas. TEX. BUS. & COM. CODE § 15.04.

80.     The System integrated a multi-year non-compete clause into Dr. Varghese's employment contract despite the System knowing it acquired and maintained a monopoly over Abilene's medical provider market. This maneuver, as applied, has led to Dr. Varghese being "frozen out" of the Abilene medical market and from no longer being able to practice

cardiovascular medicine in the Abilene area. Furthermore, the System revoked Dr. Varghese's medical privileges because of the System's discriminatory animus against him due to his race, color, national origin, and age. The System owns the only hospital in town in which Dr. Varghese can perform cardiovascular surgery. Therefore, the System has unreasonably restrained Dr. Varghese's ability to practice his trade in the region, which is in direct violation of the TFEAA.

81.     In addition, the TFEAA prohibits active or attempted monopolization of trade or commerce. TEX. BUS. & COM. CODE § 15.05(b). Despite the concerns raised by the OAG, the System willfully acquired Abilene Regional, its only then-existing major competitor. The System even acknowledged as such in its COPA application, stating that the System already owned 35 of the medical facilities in Abilene, leaving none that provide intensive cardiovascular care. Additionally, the System acquired the Surgical Center and rather than continue the Surgical Center's provision of affordable out-patient healthcare, the System converted the Surgical Center into hospital-affiliated service. The System's actions were calculated to ensure that the System obtains a monopoly over the medical provider market in Abilene and to line its pockets at the expense of the public. Therefore, the System has willfully obtained a monopoly over the medical provider market in the region, which is in direct violation of the TFEAA.

***Count IV – Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq.***

82.     Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

83.     "RICO creates a [civil] cause of action for '[a]ny person injured in this business or property.'" *Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 936 (2025) (quoting 18 U.S.C. § 1964(c)). To maintain such a claim, the plaintiff need not allege a racketeering or RICO-type

injury; all that is required is business or property harm resulting from the defendant's predicate acts. *Id.* at 942–43.

84.    In its COPA application, the System represented, via wire or mail, that the merger would, among other things, eliminate or reduce healthcare costs and improve efficiency. Additionally, in each of the System's last three annual performance reports and 14 quarterly performance reports, the System has represented, via wire or mail, that it has been successful at reducing healthcare costs. Even further, in the System's latest quarterly performance report filed by the System via wire or mail,[32] the System represented that it "continues to adhere to the structured process…to reduce costs and improve efficiency." However, the System's representations are fraudulent.

85.    According to the System's own cost summaries, the cost for *every* ancillary health service and *every* physician service has increased over the life of the System's COPA. Specifically, the System is charging its patients *over 30% more* for laboratory services, imaging services, pharmacy services, respiratory therapy services, and physician visits and evaluations. This rate is *six times greater* than the difference in the U.S. inflation rate between the issuance of the System's COPA and the time the System filed the quarterly performance report at issue.

86.    In each of the System's last performance reports it filed with the THHSC, the System made false, fraudulent claims that it was reducing healthcare costs in the region—all while obtaining a monopoly prohibiting rural Texans from obtaining healthcare in the region other than through the System. The System made these representations with the intent to defraud the THHSC and the public for its own financial benefit.

---

[32] *See* **Exhibit 11**.

**ORIGINAL COMPLAINT**                                    **PAGE 28 OF 31**

87.     As a direct and proximate result of the System's predicate acts in violation of 18 U.S.C. § 1962, Dr. Varghese suffered harm to his business and property. Under the provisions of RICO, Dr. Varghese is entitled to recover economic and treble damages, costs of suit, and attorneys' fees.

## CAUSE OF ACTION AGAINST ALL DEFENDANTS

### *Count I – Conspiracy to Violate Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq.*

88.     Dr. Varghese re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

89.     In violation of 18 U.S.C. 1962(d), Defendants, and each of them, by their words or actions, objectively manifested an agreement to commit a pattern of racketeering activity—i.e., mail or wire fraud—with knowledge that such acts would protect Defendants from the revocation of their COPA protection, opening up Defendants to antitrust enforcement, and result in a pecuniary loss to Dr. Varghese in the form of lost business relations.

90.     Defendants, and each of them, by their words or actions, objectively manifested an agreement on the common purpose of this enterprise—i.e., the spread of fraudulent information by and through the mail or wire to avoid liability for their unlawful discrimination and anti-competitive conduct.

91.     Further, Defendants, by their words or actions, objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity. Defendants agreed to commit predicate crimes, aid and abet commission of predicate crimes by other members of the enterprise, or that some members of the enterprise would commit the predicate acts for the benefit of all members or the enterprise.

**ORIGINAL COMPLAINT**                                                    **PAGE 29 OF 31**

92.     As a direct and proximate result of Defendant's wrongful conduct, Defendants caused harm or injury to Dr. Varghese's business relations and property. Under the provisions of RICO, Dr. Varghese is entitled to recover economic and treble damages, costs of suit, and attorneys' fees.

## REQUEST FOR ATTORNEYS' FEES

93.     Pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 4304, Dr. Varghese is entitled to recover reasonable and necessary attorneys' fees that are equitable and just.

## DEMAND FOR JURY TRIAL

94.     Dr. Varghese demands a trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Varghese prays that the Court: (i) issue citation for Hendrick Provider Network d/b/a Hendrick Clinic and Hendrick Health System to appear and answer herein; (ii) enter judgment against Hendrick Provider Network d/b/a Hendrick Clinic and Hendrick Health System; and (iii) award Dr. Varghese compensatory damages, punitive damages, attorneys' fees, court costs, and such other and further relief, both general and special, at law or in equitable, to which Dr. Varghese may show himself justly entitled.

DATE: August 25, 2025                Respectfully submitted,

**WEST, WEBB, ALLBRITTON & GENTRY, P.C.**
1515 Emerald Plaza
College Station, Texas 77845
Telephone: (979) 694-7000
Facsimile: (979) 694-8000

By:     */s Gaines West*
        GAINES WEST
        State Bar No. 21197500
        gaines.west@westwebblaw.com

**ORIGINAL COMPLAINT**                                      **PAGE 30 OF 31**

JOHN "JAY" RUDINGER, JR.
State Bar No. 24067852
jay.rudinger@westwebblaw.com

*Counsel for Plaintiff*

cc:     The Honorable Kenneth Paxton
        Office of the Attorney General of Texas
        P.O. Box 12548
        Austin, Texas 78711

cc:     Consumer Response Center
        Federal Trade Commission
        600 Pennsylvania Avenue, NW
        Washington, D.C. 20580

cc:     The Honorable Nancy Larson
        U.S. Attorney for the Northern District of Texas
        U.S. Department of Justice
        1100 Commerce Street, Third Floor
        Dallas, Texas 75242

**ORIGINAL COMPLAINT**                                    **PAGE 31 OF 31**